UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| MARK E. BAILEY<br>(Social Security No. XXX-XX-8099),<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | 3:09-cv-151-WGH-RLY |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 13, 25) and an Order of Reference entered by Chief Judge Richard L. Young on March 14, 2011 (Docket No. 26).

**I. Statement of the Case**

Plaintiff, Mark E. Bailey, seeks judicial review of the final decision of the agency, which found him not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f). The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff initially applied for DIB on April 28, 2004, alleging disability since December 31, 1999. (*See* R. 68). The agency denied Plaintiff's application both initially and on reconsideration. (R. 68). Plaintiff appeared and testified at a

hearing before Administrative Law Judge M. Kathleen Gavin ("ALJ") on August 16, 2005. (R. 68). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 68). On October 3, 2005, the ALJ issued her opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the economy. (R. 68-74). There is no evidence in the record that demonstrates that Plaintiff took any further action regarding this first application for DIB.[1]

Plaintiff again applied for DIB on October 31, 2005, again alleging disability since December 31, 1999. (R. 107-09). The agency denied Plaintiff's application both initially and on reconsideration. (R. 82-85, 89-95). Plaintiff appeared and testified at a hearing before Administrative Law Judge George Jacobs on April 9, 2008. (R. 21-61). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 21). On October 30, 2008, the ALJ issued his opinion finding that Plaintiff was not disabled because he retained the RFC to perform a significant number of jobs in the economy. (R. 10-19). The

---

[1]Consequently, this decision should have been res judicata, and Plaintiff should not have been entitled to re-argue whether he was disabled from his alleged onset date of December 31, 1999, until the date of ALJ Gavin's decision on October 3, 2009. 20 C.F.R. § 404.957. Additionally, Plaintiff was only insured for DIB benefits through December 31, 2005. Therefore, he would have been left only able to argue that new evidence existed between October 3, 2005 and December 31, 2005, that demonstrated his disability. And, in fact, the previous decision of October 3, 2005, was mentioned at Plaintiff's second hearing. (R. 60). Nevertheless, the decision by ALJ Jacobs makes no mention of the prior decision or res judicata. When an ALJ declines to apply res judicata, we are to review the second claim on the merits. *See Byam v. Barnhart,* 336 F.3d 172, 180 (2d Cir. 2003)(if ALJ has considered second application on the merits, then the first application is deemed constructively reopened and res judicata is waived). We follow *Byam* because, while the Seventh Circuit has not directly addressed this issue, it has cited *Byam* in *Buchholtz v. Barnhart,* 98 Fed.Appx. 540, 543-44 (7th Cir. 2004)(an unpublished decision).

Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 3-5). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on October 22, 2009, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Born on October 28, 1954, Plaintiff was 54 years old at the time of the ALJ's decision, with a high school education. (R. 17). His past relevant work experience included a job as a coal mine laborer. (R. 17).

### B. Medical Evidence

#### 1. Plaintiff's Impairment's

Plaintiff was involved in a car accident in May 1992, in which he suffered a head injury and a pelvic fracture, and he was hospitalized for approximately three months. (R. 203, 215). Plaintiff returned to work as a coal mine laborer in 1996 and continued to work for the next three years. (R. 203, 215). Plaintiff stopped working on December 31, 1999, when the mine where he was employed at closed. (R. 203, 215).

In May 2004, Plaintiff underwent a mental status examination by D. Shaner Gable, Ph.D. (R. 203-08). Plaintiff's presenting complaint was that he "had loads and loads of psychological reports saying I'm not fit to be in the workplace." (R. 203). Plaintiff reported that he had difficulty climbing stairs, drops objects, and was unable to bend, squat, or walk more than two blocks. (R. 204). He also reported that he suffers from depression and had difficulty with

memory, reading or understanding instructions, concentration, and language. (R. 204). Dr. Gable noted that Plaintiff's gait was grossly normal and that his mood was euthymic. (R. 203). Dr. Gable found that Plaintiff's abstract reasoning was within normal limits; he was able to add, subtract, multiply, divide, and perform calculation tasks; he had no deficits in judgment and insight; and his information skills were intact. (R. 205). Plaintiff's daily activities included performing self-care tasks, going to the bank, performing yard work, going shopping, mowing yards, and watching television. (R. 207). Plaintiff's scores on the Wechsler Adult Intelligence Scale ("WAIS") fell between low and high average with processing speed in the borderline range. (R. 206). Dr. Gable stated that Plaintiff's performance on the WAIS indicted that he had average functioning overall. (R. 206). Dr. Gable noted that, because Plaintiff's processing speed was borderline, he may have some difficulties if he were placed in a job where quick, accurate judgments were required. (R. 206). However, Dr. Gable opined that Plaintiff's lowered processing speed would not affect his performance on jobs in which he was able to work at his own pace. (R. 206). Plaintiff's scores on the Wechsler Memory Scale ("WMS") fell within the average to high average range, which led Dr. Gable to opine that Plaintiff would experience few, if any, memory-related problems on the job. (R. 207). Dr. Gable diagnosed Plaintiff with Adjustment Disorder with Mixed Anxiety and Depressed Mood. (R. 208). Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 70, which indicated that Plaintiff had some mild symptoms or

mild difficulty in social, occupational, or school functioning, but was generally functioning pretty well. (R. 208).

In June 2004, Albert Fink, Ph.D., performed another consultative mental status evaluation on Plaintiff. (R. 215-18). Plaintiff alleged memory loss, mood swings, sleep apnea, right knee pain, high blood pressure, and hearing loss. (R. 215). Plaintiff complained that he had difficulties concentrating and following instructions and that he had pain in his right knee. (R. 215). Plaintiff reported that his daily activities included performing personal hygiene, dressing himself, doing laundry, performing housekeeping tasks, driving a car, mowing his yard, and watching television. (R. 217). Dr. Fink noted that Plaintiff's grooming was excellent, that he was friendly and cooperative, and that he interacted easily with no evidence of distress. (R. 216). He reported that Plaintiff's gait and coordination were unremarkable. (R. 216). Dr. Fink found that Plaintiff's cognitive structure was basically intact; he had no difficulty with simple arithmetic computation; his judgment and insight were adequate; his mood was positive and affect within normal limits; and his speech was logical and sequential. (R. 216). Dr. Fink noted that there was no evidence of unusual thought processes, bizarre ideation, or suicidal thinking. (R. 216). WAIS testing indicated that Plaintiff had low average to average intellectual functioning. (R. 217-18). Dr. Fink noted that considerable intratest scattering of intelligence testing results suggested that Plaintiff had higher potential than indicated by the test. (R. 217). WMS testing indicated that Plaintiff had essentially normal memory functioning. (R. 217). Dr. Fink opined that Plaintiff was capable of

dealing with memory tasks found in the typical work environment and social settings. (R. 217). Dr. Fink opined that, from a mental standpoint, Plaintiff was capable of functioning adequately within typical work environments and social settings. (R. 218). Dr. Fink did not diagnose Plaintiff with any mental impairment. (R. 218). He assessed Plaintiff as having a GAF score of 70, which indicated that Plaintiff had some mild symptoms or mild difficulty in social, occupational, or school functioning, but was generally functioning pretty well. (R. 218).

On March 21, 2005, David Greer, M.D., a family practice physician, saw Plaintiff. (R. 301). Dr. Greer noted that Plaintiff complained of ongoing "clicking" in his right knee, but reported that his knee had not given way on him or locked, that it had not been swollen or red, and that there was no particular tenderness or pain. (R. 301). Dr. Greer's clinical examination findings were unremarkable. (R. 301). Dr. Greer diagnosed Plaintiff with high blood pressure, high cholesterol, erectile dysfunction, and chondromalacia. (R. 301).

In July 2005, an MRI revealed that Plaintiff had a tear in his lateral meniscus with some irritation of cartilage in his kneecap. (R. 275).

On August 12, 2005, Dr. Greer composed a letter stating that Plaintiff's physical problems were "moderately severe." (R. 274). He opined that Plaintiff would be able to sit or stand for an eight-hour day, but probably not continuously in either position. (R. 274). Dr. Greer stated that he believed that Plaintiff could be categorized as being totally disabled as a result of his past motor vehicle accident sustained in 1992. (R. 274).

On August 15, 2005, Plaintiff presented to Timothy Hamby, M.D., an orthopaedic surgeon, with a chief complaint of "I am trying to get social security disability." (R. 327-28). Plaintiff told Dr. Hamby that his knee did not really hurt, but that it occasionally bothered him after walking a block or two. (R. 327). Plaintiff's main complaint was that he heard and felt a pop in his knee with flexion and extension of the knee. (R. 327). When Dr. Hamby asked whether Plaintiff was experiencing any pain, Plaintiff reported that he was not. (R. 327). Dr. Hamby obtained X-rays of Plaintiff's knees, which revealed no abnormalities. (R. 327). Dr. Hamby reviewed the previous MRI and diagnosed Plaintiff with an undersurface tear of the lateral meniscus and moderate irritation of cartilage in his kneecap. (R. 327). Dr. Hamby reported that he discussed treatment options with Plaintiff, but since Plaintiff told him that his knee was not hurting him at that time, Dr. Hamby told him to call if his knee pain flared up. (R. 328). He told Plaintiff that he did not believe that this knee injury would require any surgical intervention. (R. 328). Dr. Hamby stated that he would not recommend any formal treatment for Plaintiff's knee. (R. 328).

On August 19 and September 2, 2005, Jeffrey Gray, Ph.D., performed a consultative neuropsychological examination on Plaintiff. (R. 462-67). Dr. Gray noted that Plaintiff's affect was a bit depressed and more than anything else somewhat labile. (R. 463). He noted that there were no clear signs of anxiety. Dr. Gray stated that Plaintiff's attention span and concentration generally appeared to be low normal, but that his selective and divided attention and attending with competing stimuli were quite impaired. (R. 463). He reported

that no confusion per se was noted. He found that Plaintiff was able to comprehend procedural instructions with some repetition at times. Plaintiff displayed low normal vocabulary, articulation, and phrasing. Plaintiff's gait and station were intact. (R. 463). WAIS testing indicated that Plaintiff's general intellectual ability was in the lower end of the low average to upper borderline range. (R. 463). Plaintiff displayed functional academic abilities. (R. 465). A Conners' Continuous Performance Test suggested that Plaintiff had some attentional problems. (R. 465). Dr. Gray stated that Plaintiff demonstrated an inability to sustain attention and showed signs of inattentiveness. (R. 465). A memory test indicated that Plaintiff's memory was well within normal limits. (R. 466). A Minnesota Multiphasic Personality Inventory was remarkable for depression. (R. 466). Dr. Gray believed that Plaintiff's testing results, in conjunction with his reported history, were consistent with an acquired brain injury. (R. 466). Dr. Gray opined that Plaintiff would have a great deal of difficulty with complex, detailed, and even simple, repetitive types of tasks. (R. 467). Dr. Gray stated that Plaintiff's ability to perform simple, repetitive tasks was compromised by his inefficient processing and difficulties with attention. (R. 467). He stated that perhaps Plaintiff's greatest difficulty would be one of consistency. (R. 467). Dr. Gray opined that Plaintiff would have a difficult time handling work-like stresses and being reliable and independent. (R. 467). He further opined that Plaintiff would have a difficult time consistently remembering work rules and would have a great deal of difficulty solving problems. (R. 467). Dr. Gray opined that Plaintiff's ability to consistently do even simple, repetitive

types of tasks would be significantly compromised due to his problems with consistency. (R. 467).

On January 4, 2006, Dr. Gray performed another consultative examination. (R. 269-73). Dr. Gray again opined that Plaintiff's major difficulties seemed to revolve around the inefficient processing of incoming sensory information. (R. 270). He reported that Plaintiff's cognitive functions were in the lower end of the low average to upper borderline range. (R. 272). Dr. Gray opined that Plaintiff's ability to initiate social contacts with others, communicate clearly with others, cooperate with others, and appreciate the feelings of other people appeared to be somewhat impaired. (R. 272). Dr. Gray again opined that, although he had the intellectual abilities to perform simple, repetitive types of tasks, Plaintiff would have a difficult time performing simple, repetitive tasks in a consistent manner. (R. 273). He also opined that Plaintiff would have at least some degree of difficulty consistently relating to co-workers and interacting with supervisors. (R. 273). Dr. Gray diagnosed Plaintiff with Dementia Due to Head Trauma and Major Depressive Episodes. (R. 273). He assigned a GAF score of 50, which indicated that Plaintiff had serious symptoms or a serious impairment in social, occupational, or school functioning. (R. 273).

On January 18, 2006, John Roberts, D.O., conducted an internal medicine physical examination. (R. 263-67). At the examination, Plaintiff told Dr. Roberts that he had been able to successfully work when he was allowed to work at his own pace. (R. 263). Plaintiff stated that, when he was allowed to

work at his own pace, his alleged disabilities did not show up. (R. 263). Plaintiff reported that he was able to perform basic activities of daily living. (R. 264). Dr. Roberts noted that Plaintiff was able to bend over and attend to footwear without difficulty and get on and off of the examination table without difficulty. (R. 264). He ambulated with a normal gait, which was not unsteady, lurching, or unpredictable. (R. 264). Plaintiff was able to walk on toes, walk on heels, and tandem walk without difficulty. (R. 267). He was also able to stand on either leg alone and perform a full squat maneuver without difficulty. (R. 267). Dr. Roberts stated that Plaintiff was stable at station and appeared comfortable in the seated and supine positions. (R. 264). He reported that Plaintiff's speech was fluent and that he followed directions and commands without difficulty. Plaintiff's intellectual function was grossly normal. (R. 264). Dr. Roberts' musculoskeletal examination revealed almost entirely normal findings. (R. 265-66). Plaintiff's muscle strength was normal throughout and his sensation was intact. (R. 266). Dr. Roberts opined that Plaintiff was able to work eight hours a day in a seated, standing, or ambulatory position. He opined that Plaintiff could lift five to ten pounds continuously and 50 pounds occasionally. (R. 267). He found that Plaintiff had full use of his upper extremities in terms of grasping, pushing, pulling, or manipulating. (R. 267). He further found that Plaintiff had full use of his lower extremities for operating foot controls. (R. 267). Dr. Roberts opined that Plaintiff should be able to work around moving machinery and continuously operate automotive equipment. (R. 267). He also opined that

Plaintiff could bend, squat, crawl, climb, and work around unprotected heights. (R. 267).

### 2. State Agency Review

On January 26, 2006, Dr. Horton B. Randal, a state agency reviewing psychologist, examined Plaintiff's record. (R. 254-62). Dr. Randal opined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace with no episodes of decompensation. (R. 257). Dr. Randal noted that Plaintiff was able to be social, drive, do simple chores and meals, maintain hygiene, shop, handle money, and attend church. (R. 262). He also noted that Plaintiff had a work history that ended secondary to a plant closing. (R. 262). Dr. Randal noted that Plaintiff worked in a structured setting at his past job, which seemed to help him with his physical and psychological limitations. (R. 262). Based on his review of the medical evidence of record and Plaintiff's activities of daily living, Dr. Randal opined that Plaintiff retained the ability to perform simple, repetitive tasks without special accommodations. (R. 262). On April 19, 2006, F. Kladder, Ph.D., affirmed Dr. Randal's decision. (R. 252).

In February 2006, Dr. J. Sands, a state agency reviewing physician, opined that Plaintiff did not have a severe physical impairment. (R. 248). Dr. B. Whitley, another state agency reviewing physician, affirmed Dr. Sands' opinion on April 19, 2006. (R. 253).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the Court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.

The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through December 31, 2005; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 12). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had three impairments that are classified as severe: chronic brain syndrome; right knee meniscal tear; and obesity. (R. 12). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of his limitations were not fully credible. (R. 14-17). Consequently, the ALJ concluded that Plaintiff retained the RFC for light work with performing postural activities occasionally; no kneeling, crawling, or climbing ladders/ropes/scaffolds; he must avoid workplace hazards; he can perform no pushing or pulling with the right lower extremity; and he is limited to simple work that is goal oriented with

no production rate pace work, and occasional contact with supervisors/ co-workers, but no contact with the public. (R. 13-14). The ALJ opined that Plaintiff did not retain the RFC to perform his past work. (R. 17). However, Plaintiff could perform a substantial number of jobs in the regional economy, including 2,200 cleaner jobs and 1,200 watchman jobs. (R. 18). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 18).

## VI.  Issues

Plaintiff has raised two issues. The Court notes one additional issue concerning the presentation of "new" evidence. The issues are as follows:

1. Whether consideration of new evidence requires a remand.
2. Whether the ALJ properly rejected the opinions of Dr. Gray.
3. Whether the ALJ properly considered Plaintiff's obesity.

**Issue 1: Whether consideration of new evidence requires a remand.**

Plaintiff asks this Court to consider a psychological evaluation performed by Jack Cole, Ph.D., on December 20, 2008. (R. 479-82). This evaluation was performed after ALJ Jacobs rendered his decision. A federal court may not consider new evidence in reviewing the ALJ's decision. *Rasmussen v. Astrue,* 2007 WL 3326524 at *4 (7th Cir 2007). However, the Court may remand for an ALJ to consider additional evidence if such evidence is both new and material and if there has been shown good cause for the failure to incorporate the evidence into the record in a prior proceeding. 42 U.S.C. § 405(g); *Schmidt v. Barnhart,* 395 F.3d 737, 741-42 (7th Cir. 2005). Evidence is considered "new" if

it was not available or in existence at the time of the administrative proceeding. *Schmidt*, 395 F.3d at 741-42. The evidence is "material" if there is a reasonable probability that the ALJ would have reached a different conclusion had he considered the evidence, meaning that the evidence must be relevant to plaintiff's condition during the relevant time period under consideration by the ALJ. *Id.*

In this case, Plaintiff has only applied for DIB benefits and his date last insured was December 31, 2005. The evaluation by Dr. Cole was performed nearly three years after Plaintiff's date last insured. Thus, the evaluation does not qualify as "material" evidence because it could not possibly be considered by an ALJ in determining whether Plaintiff was disabled before December 31, 2005. Consequently, remand is not necessary in this instance.

**Issue 2: Whether the ALJ properly rejected the opinions of Dr. Gray.**

Plaintiff also argues that the ALJ committed reversible error when he failed to adopt the findings of Dr. Gray. Dr. Gray saw Plaintiff for two consultative exams; in September 2005, he opined that Plaintiff's ability to consistently do even simple, repetitive tasks would be significantly compromised due to his problems with consistency (R. 467), and in January 2006, he opined that Plaintiff would have a difficult time performing simple, repetitive tasks in a consistent manner (R. 273). He based these opinions at least partially on the results of the Conners' Continuous Performance Test which demonstrated that Plaintiff had significant problems with attention. (R. 465).

-15-

Dr. Gray's opinion is that of a "consulting physician."  20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d)  How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
> >
> > > (i)  Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight

we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related

> to his or her area of specialty than to the opinion of a source who is not a specialist.
>
> (6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C.F.R. § 404.1527.

In this case, the ALJ's rejection of Dr. Gray's opinions is supported by the record. Dr. Gray's opinions were inconsistent with the opinions of two examining psychologists, Dr. Fink and Dr. Gable, who both found only mild limitations in Plaintiff's social, occupational, or school functioning. (R. 208, 218). Dr. Fink opined that, from a mental standpoint, Plaintiff was capable of functioning adequately within typical work environments and social settings. (R. 218). And, Dr. Gable opined that Plaintiff's lowered processing speed would not affect his performance on jobs in which he was able to work at his own pace. (R. 206). Additionally, Dr. Gray's opinions were inconsistent with the findings of state agency psychologists Dr. Randal and Dr. Kladder, who opined that Plaintiff retained the ability to perform simple, repetitive tasks without special accommodations. (R. 252, 262). Therefore, there was substantial evidence in the record for the ALJ to reject the opinions of Dr. Gray.

Plaintiff also argues that it was noteworthy that the ALJ never actually mentioned the results of the Conners' Continuous Performance Test. However, the ALJ conducted a very thorough analysis of Dr. Gray's opinions at R. 15-16. The ALJ specifically noted Dr. Gray's opinions concerning Plaintiff's attention, including the opinion that Plaintiff's attention span and concentration generally appeared to be low normal, but that his selective and divided attention and attending with competing stimuli were quite impaired. (R. 15, 463). The fact that one test was not mentioned by name does not tarnish the ALJ's decision.

**Issue 3: Whether the ALJ properly considered Plaintiff's obesity.**

Finally, Plaintiff argues that the ALJ found his obesity to be a severe impairment, but then disregarded it throughout the remainder of his decision. On this matter, Plaintiff's argument is completely unfounded. ALJ Jacobs clearly indicated at step three of the five-step evaluation process that, even considering Plaintiff's obesity in accordance with SSR 02-1p, Plaintiff's impairments did not meet or equal any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12). Additionally, the ALJ indicated that Plaintiff's RFC (which included no kneeling, crawling, or climbing) accounted for limitation of activities due to knee pain and obesity. (R. 17). Plaintiff has simply failed to demonstrate the existence of any objective medical evidence that indicates that his obesity led to a more limited RFC than that given by the ALJ.

## VII. Conclusion

Remand is not necessary for consideration of new evidence. Additionally, the ALJ reasonably concluded that the opinions of Dr. Gray were outweighed by

objective medical evidence from numerous other sources. Finally, the ALJ properly accounted for Plaintiff's obesity. The final decision of the Commissioner is, therefore, **AFFIRMED.**

**SO ORDERED** the 31st day of March, 2011.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Mark David Geheb
LAW OFFICE OF JOE D. BLACK
mgeheb@sbcglobal.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov